*Decisions will be entered for the petitioners.*

PHOTO-SONICS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3255–62.    Filed August 21, 1964.

*Sidney R. Reed*, for the petitioner.
*Donald D. Winn* and *Herbert T. Ikazaki*, for the respondent.

FAY, *Judge:* The Commissioner determined deficiencies in petitioner's income tax, as follows:

| Fiscal year ended Aug. 31— | Deficiency |
|---|---|
| 1958 | $9, 377. 46 |
| 1959 | 33, 543. 48 |
| 1960 | 59, 183. 33 |

The only issue for decision[1] is whether or not petitioner's method of valuing its inventories, by only including as an item of cost its expenditures for direct labor and direct materials, most clearly reflects its income and conforms as nearly as may be to the best accounting practice for a manufacturing concern.

FINDINGS OF FACT

Some of the facts have been stipulated, and the stipulations of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

[1] Petitioner has conceded the remaining adjustments made by respondent for the fiscal year ended Aug. 31, 1960.

Petitioner is a California corporation organized on September 24, 1952. Its office and principal place of business is located in Burbank, Calif. Petitioner maintained its books on an accrual basis, using a fiscal year ending August 31. It filed Federal corporation income tax returns for the fiscal years here involved with the district director of internal revenue at Los Angeles, Calif.

Petitioner's outstanding capital stock is, and has been at all times material to this proceeding, wholly owned by Edward Furer (hereinafter referred to as Furer).

The Acme Camera Corp. (hereinafter referred to as Acme) was a corporation organized under the laws of the State of California on September 24, 1952. Prior to December 1958 the entire capital stock of Acme was owned by Furer. In December 1958 Furer contributed to the petitioner all of the outstanding capital stock of Acme. Petitioner then liquidated Acme in a tax-free liquidation. The liquidation was effective as of January 1, 1959, at which time petitioner took over all of Acme's assets. Acme, during the period of its existence, was engaged in the manufacture and sale of optical printers.

During the first 2 years of petitioner's existence, it was engaged in the business of buying and selling high-speed cameras and other equipment related to the motion-picture industry. Some time during its fiscal year ended August 31, 1955, petitioner commenced the manufacture of high-speed cameras and related equipment. Petitioner has continuously been engaged in the manufacture and sale of such cameras from 1955 to the time of the trial of this proceeding.

Ever since commencing manufacturing operations in its fiscal year 1955 petitioner has valued its inventories by including therein only its costs for direct labor and direct materials. Expenses for factory rent, factory depreciation, and other factory overhead expenses were charged to profit and loss for the period in which they were incurred. This method utilized by petitioner for valuing its inventories is known as the prime cost method.

During the fiscal years 1955 through 1960, the petitioner's costs for direct labor, direct material purchases, and factory overhead expenses were as follows:

| Fiscal year ended Aug. 31— | Direct labor | Direct material purchases | Factory overhead expenses |
|---|---|---|---|
| 1955 | $42,400.68 | $81,701.70 | $9,812.45 |
| 1956 | 68,424.95 | 18,035.32 | 17,684.96 |
| 1957 | 95,867.98 | 38,098.07 | 23,626.10 |
| 1958 | 100,918.07 | 112,134.04 | 26,609.85 |
| 1959 | 498,785.25 | 483,254.87 | 136,150.23 |
| 1960 | 566,832.74 | 464,887.48 | 311,868.77 |

The amounts of direct labor and direct materials included by petitioner in its closing inventory of work in process for the fiscal years 1955 through 1960 were as follows:

| Closing inventory Aug. 31— | Direct labor | Direct materials |
|---|---|---|
| 1955 | $17,734.04 | $14,079.67 |
| 1956 | 20,757.79 | 6,112.54 |
| 1957 | 22,522.21 | 9,184.60 |
| 1958 | 74,979.69 | 70,419.60 |
| 1959 | 213,223.91 | 237,370.49 |
| 1960 | 214,303.96 | 239,882.58 |

The direct labor contained in the petitioner's closing inventories of finished goods for the fiscal years 1959 and 1960 was $18,305.13 and $36,805.45, respectively. There was no direct labor contained in the finished goods closing inventories of petitioner for the fiscal years 1955 through 1958.

Petitioner's closing inventories of work in process and finished goods as shown in its books and reported on its tax returns for the years 1955 through 1960 were as follows:

| Closing inventory Aug. 31— | Work in process | Finished goods |
|---|---|---|
| 1955 | $31,813.71 | $7,616.73 |
| 1956 | 26,870.33 | 7,616.73 |
| 1957 | 31,706.81 | 463.32 |
| 1958 | 145,399.29 | 3,956.57 |
| 1959 | 450,594.40 | 51,382.05 |
| 1960 | 454,186.54 | 94,503.84 |

The factory overhead expenses for the fiscal years 1958, 1959, and 1960, broken down into the different items of expense, are as follows:

| Item of expense | Fiscal year ended Aug. 31— | | |
|---|---|---|---|
| | 1958 | 1959 | 1960 |
| Supervision | | $4,380.88 | $6,312.20 |
| Utilities | $4.18 | 1,938.27 | 6,103.14 |
| Insurance—general, compensation, and group | 2,318.42 | 7,196.71 | 13,362.58 |
| Repairs and maintenance | | 7,893.89 | 20,366.06 |
| Rent, building | 2,400.00 | 13,900.00 | 54,000.00 |
| Payroll taxes | 2,958.55 | 13,760.10 | 17,473.43 |
| Property taxes | 2,290.29 | 6,543.30 | 14,358.85 |
| Shop and tool expenses | 8,215.34 | 40,397.22 | 103,896.18 |
| Depreciation, machinery | 3,715.89 | 17,133.45 | 32,009.76 |
| Amortization, leasehold | | 1,207.41 | 13,242.13 |
| Engineering salaries | 476.26 | | |
| Draftsmen and clerks | | 180.60 | 287.27 |
| Engineering supplies | 867.53 | 6,704.46 | 9,293.81 |
| Freight and express | 521.39 | 575.05 | |
| Vacation salaries | 2,842.00 | 14,059.89 | 20,767.98 |
| Experimental | | | 395.38 |
| Miscellaneous | | 279.00 | |
| Total | 26,609.85 | 136,150.23 | 311,868.77 |

Of the 17 different categories of expense items, only 4 would remain fixed regardless of the level of production. They are: Rent, deprecia-

tion, amortization, and property taxes. All the other expenses to some degree would vary in direct relation to the level of production.

Petitioner moved into a new plant during its fiscal year ended August 31, 1960. Petitioner utilized at least 33 percent more employees and machines in the new plant than it did in the old one.

In the statutory notice of deficiency the respondent made inventory adjustments which had the effect of increasing petitioner's taxable income for the fiscal years 1958, 1959, and 1960. The increase in taxable income as determined by the respondent was the result of respondent's increasing closing inventories in each year [2] by allocating to said inventories a portion of petitioner's factory overhead expenses incurred in each year. The method utilized by respondent is known as the absorption costing method. The respondent, in adjusting the petitioner's inventories, allocated the petitioner's factory overhead expenses to said inventories by using a ratio that total factory overhead expenses for each year bore to the total direct labor costs for the year, and then applying that ratio or percentage to the direct labor costs in the ending work in process and finished goods inventories for the year to determine the amount of factory overhead expenses to be allocated to inventories. Respondent's method of valuing petitioner's inventories, after taking into consideration certain concessions made by respondent,[3] results in an increase of taxable income for the fiscal years 1958, 1959, and 1960 in the respective amounts of $14,219.29, $43,437.54, and $74,952.97.

During the fiscal years 1959 and 1960, petitioner's officers and their annual salaries were as follows:

| Officer | Title | 1959 | 1960 |
| --- | --- | --- | --- |
| Edward Furer | President | $25,000.00 | $48,800 |
| Jack Kiel | Vice president | 8,000.00 | 20,800 |
| Roy Edwards | do | 9,657.24 | 19,200 |
| A. J. Furer | do | 3,500.00 | 5,200 |
| Frank Shea | Secretary-treasurer | 3,475.00 | 4,800 |
| | | 49,632.24 | 98,800 |

During the fiscal years 1959 and 1960 Kiel was petitioner's executive vice president. He served as general manager of the business. The major business decisions regarding petitioner's operations were made

---

[2] In addition to adjusting petitioner's inventories for the fiscal years 1958, 1959, and 1960, respondent adjusted petitioner's inventories for the fiscal years 1955, 1956, and 1957. Pursuant to sec. 481, I.R.C. 1954, the resulting additional taxable income caused by the adjustment to inventory created a tax deficiency of $1,983.44, which is part of the deficiency for the fiscal year 1958.

[3] Respondent, through a supplemental stipulation and an oral concession at the trial of this case, agreed that the total factory overhead expenses for the fiscal years 1959 and 1960 utilized in the statutory notice of deficiency were too high. The parties agreed that the factory overhead expenses for the fiscal years 1959 and 1960 were $136,150.23 and $311,868.77, respectively. The amounts used by respondent in his notice of deficiency were $173,567.62 and $399,001.45.

by Edward Furer. Respondent allocated for the fiscal years 1959 and 1960 to factory overhead expenses the salary paid to Kiel. The amounts of officers' salaries allocated to factory overhead expenses represent approximately 16 percent of the total officers' salaries for fiscal 1959 and approximately 21 percent for fiscal 1960.

Petitioner's tax returns for the taxable period September 24, 1952, to August 31, 1953, and for the fiscal years ended August 31, 1954, and August 31, 1955, were examined by an internal revenue agent. As of August 31, 1955, petitioner's income tax return reflected total inventories of $39,885.96. The result of the examination of petitioner's return for the fiscal year 1955 was the reduction of a net operating loss by capitalizing a freight charge. No other adjustment was recommended for that year by the examining agent.

ULTIMATE FINDINGS OF FACT

Petitioner's method of inventory valuation in which all factory overhead expenses are charged off currently and excluded from inventory costs does not clearly reflect its income and does not conform to accepted accounting standards for a manufacturing concern.

OPINION

Petitioner, a manufacturer of high-speed cameras, values it work in process and finished goods inventories by including in inventory costs only its expenditures for direct labor and direct materials attributable to those inventories. Petitioner maintains that this method of valuing inventories is known as the direct cost method. Petitioner argues that this method has acceptance of the accounting profession and that this method clearly reflects its income. Petitioner further contends that it has used this method constantly from the inception of its manufacturing operations and that the use of this method had the approval of the Internal Revenue Service.

Respondent, on the other hand, has revalued petitioner's inventories by use of the absorption cost method which allocates to inventory a portion of the factory overhead expenses as well as a portion of the costs of direct labor and materials. Respondent maintains that petitioner's method is not generally accepted by the accounting profession and that the method does not clearly reflect income. Respondent further maintains that petitioner does not use the direct cost method, a method which recognizes that some factory overhead expenses are to be allocable to ending inventories, but instead uses the prime cost method. Respondent denies that he approved of the method used by petitioner and asserts that he is not now precluded from challenging petitioner's use of an erroneous method of accounting. We agree with respondent.

A taxpayer must compute his taxable income under the same method of accounting by which he regularly computes his income in keeping his books. Sec. 446(a), I.R.C. 1954.[4] One of the permissible methods of accounting is an accrual method. Sec. 446(c)(2). In this case, petitioner utilized an accrual basis of accounting and did compute his taxable income under the same method as he computed his income in keeping his books. However, a method of accounting which includes the accounting treatment of any item, in this case inventories, *Fruehauf Trailer Co.*, 42 T.C. 83 (1964), is not acceptable unless the method clearly reflects income. Sec. 1.446–1(a) (1) and (2), Income Tax Regs. The Commissioner is given wide discretion in the area and his determination should not be disregarded unless the taxpayer shows that there has been a clear abuse of discretion by the Commissioner or that the latter's determination was arbitrary. *Lucas v. Structural Steel Co.*, 281 U.S. 264 (1930); sec. 446(b).

Section 471 provides that—

> Whenever in the opinion of the Secretary or his delegate the use of inventories is necessary in order clearly to determine the income of any taxpayer, inventories shall be taken by such taxpayer on such basis as the Secretary or his delegate may prescribe as conforming as nearly as may be to the best accounting practice in the trade or business and as most clearly reflecting the income.

Wherever the production and manufacturing process is an income-producing factor, inventories, both beginning and ending, are necessary to clearly reflect income. Sec. 1.471–1, Income Tax Regs.

In the instant case, petitioner, a manufacturer of high-speed cameras, was required to compute his income with the use of inventories. One of the accepted methods of computing inventories is at cost. Sec. 1.471–3, Income Tax Regs. We are concerned here with the valuation of petitioner's ending inventories. "Cost" means, with respect to merchandise produced—

> (1) the cost of raw materials and supplies entering into or consumed in connection with the product, (2) expenditures for direct labor, (3) indirect expenses incident to and necessary for the production of the particular article, including in such indirect expenses a reasonable proportion of management expenses, but not including any cost of selling or return on capital * * *

Sec. 1.471–3(c), Income Tax Regs.

Accordingly, in order for petitioner to prevail in the instant case, it must be shown that its method of valuing inventories most clearly reflects its income and that the method conforms as nearly as may be to the best accounting practice in the manufacturing business. Sec. 471, *supra;* sec. 1.471–2(a), Income Tax Regs.

We start with the premise that the Federal income tax system is based upon an annual accounting period. Sec. 441(a). The purpose

---

[4] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

of inventories is to assign to each accounting period its profits and losses. *Lucas* v. *Structural Steel Co., supra; U.S. Cartridge Co.* v. *United States*, 284 U.S. 511 (1932). With this in mind, we now turn to the facts of the instant case and the method of inventory valuation used by petitioner.

Petitioner values its inventories at cost. In determining cost of its ending work in process and finished goods inventories, petitioner allocated a portion of its costs for direct labor and direct materials to the inventories. All factory overhead expenses were charged off currently against profits, and no part was allotted to the ending inventories. Petitioner maintains that this method of valuing inventories is known as the direct cost method and that the method has the approval of both the accounting profession and the Internal Revenue Service. We disagree with petitioner.

To begin with, the petitioner does not determine the cost of its inventories by the "direct cost" method, as that term is used in the United States. The method whereby no part of the factory overhead expenses is allocated to ending inventories is known as the prime cost method. Wilmer Wright, Direct Standard Costs, 2 (1962). This is the method used by petitioner. Direct cost method recognizes that those overhead expenses which vary with production should be allocated to inventories. It is only the fixed overhead expenses such as rent and real estate taxes which are not allocated to inventories under the direct cost method. The method used by petitioner is not an accepted accounting method. The American Institute of Certified Public Accountants in its Bulletin No. 43, entitled "Restatement and Revision of Accounting Research Bulletins," p. 29, states, "It should also be recognized that the exclusion of all overheads from inventory costs does not constitute an accepted accounting procedure." This was recognized by petitioner's own expert witnesses.[5] We are of the opinion and so hold that the method used by petitioner in determining the cost of its inventories was not an accepted accounting method and that the method used did not clearly reflect petitioner's income. Cf. *D. Loveman & Son Export Corporation*, 34 T.C. 776, 804 (1960), affd. 296 F. 2d 732 (C.A. 6, 1961), certiorari denied 369 U.S. 860 (1962); *Frank G. Wikstrom & Sons, Inc.*, 20 T.C. 359 (1953).

Respondent, in redetermining the cost of petitioner's inventories, used the method known as absorption costing. Under this method, a portion of all the factory overhead expenses is allocated to the ending inventories on the theory that all the applicable expenditures incurred in bringing the goods into existence should be included in determining

---

[5] Brian Patterson and George Mordy, certified public accountants, both testified that petitioner was not using the direct costing method of accounting as that term is used and understood in this country. Patterson further testified that according to Bulletin No. 43 issued by the American Institute of Certified Public Accountants, which he was guided by, the method used by petitioner was not an acceptable method of accounting.

the value of inventories on hand at the end of an accounting period. The allocation of the factory overhead expenses can be done by the means of different formulas. In this case, respondent obtained the percent of overhead expense to direct labor and applied the resulting percent to the direct labor allocated to the ending inventories. This is one of the accepted formulas for making the allocation. Samuel Waldo Specthrie, Basic Cost Accounting (2d ed. 1963).[6]

We have already found that petitioner's method of valuing its inventories was not proper. The burden is on petitioner to show that the respondent's method was wrong. *Montreal Mining Co.*, 2 T.C. 688, 694 (1943), modified on other issues in an unreported case (C.A. 6, 1944, 33 A.F.T.R. 1660, 44-2 U.S.T.C. par. 9490). The burden to overcome the respondent's determination in this area is an extremely difficult one. *Peterson Produce Co.* v. *United States*, 205 F. Supp. 229 (D. Ark. 1962). In *Finance & Guaranty Co.* v. *Commissioner*, 50 F. 2d 1061 (C.A. 4, 1931), affirming 19 B.T.A. 1313 (1930), the Court of Appeals stated:

> Where a statute commits to an executive department of the government a duty requiring the exercise of administrative discretion, the decision of the executive department, as to such questions, is final and conclusive, unless it is clearly proven arbitrary or capricious, or fraudulent, or involving a mistake of law. * * *

Petitioner seeks to meet its burden by showing that the direct cost method has been accepted by the Internal Revenue Service and by the accounting profession and that this method more clearly reflects income than the absorption cost method. Petitioner relies upon *Geometric Stamping Co.*, 26 T.C. 301 (1956), as well as numerous articles and books written on the subject of "direct costing."[7] We have examined all of the authorities cited by petitioner and they do not persuade us to the conclusion that respondent's determination was arbitrary or was a *clear* abuse of discretion. The use of the direct cost method was not an issue in *Geometric Stamping Co.*, *supra*. This Court there stated:

> It is noteworthy that respondent never contests the propriety of the direct costing method as such. That question is not raised in the proceeding and we do not reach it. * * *

Nor are we persuaded by the English case of *Duple Motor Bodies*, *Ltd.*, 39 Tax Cas. 537 (1961), discussed by petitioner in its briefs. We

---

[6] The testimony of respondent's expert witness, Walter B. Meigs, professor of accounting and chairman of the department of accounting at the University of Southern California, was to the same effect.

[7] Wright, Direct Standard Costs (1962); Dudick, Cost Controls for Industry (1962); Donnelly, Direct Costing (1956); Wright, "Why Direct Costing Is Rapidly Gaining Acceptance," 114 J. Accountancy 40 (July 1962); Traver, "Direct costing has been allowed for tax purposes but caution in making shift is urged," 15 J. Taxation 260 (1961); Parker, "Give Consideration to Direct Costing for External Reporting" 45 N.A.A. Bull. 3 (Oct. 1963).

are dealing here with particular sections of the Internal Revenue Code. Whether or not the English tax laws are similar to those in question here is not known to us. This Court does not take judicial notice of foreign laws unless they are introduced as evidence, which is not the situation here. *J. V. Rowan*, 42 B.T.A. 493, 496 (1940), affd. 120 F. 2d 515 (C.A. 5, 1941). Furthermore, a reading of the *Duple Motor Bodies* case clearly shows that the concept of direct cost as a method of determining the value of inventories as used in England is different from the concept of direct cost as known in the United States. In England, under the direct cost method, only direct labor and direct materials are allocated to inventories with all factory overhead being charged off directly against current profits and losses. This method is known as the prime cost method in this country, a method we have already found does not clearly reflect taxable income and is not generally accepted by the accounting profession. Whether the direct cost method is generally accepted by the accounting profession or whether it would clearly reflect income if used by petitioner is not the question before this Court. It is interesting to note that the authors of the books and articles referred to us by petitioner express some doubt as to whether the direct cost method could clearly reflect income for tax purposes.[8] The question before us concerns the merits of the method used by petitioner and whether the Commissioner abused his discretion by redetermining the value of petitioner's inventories by use of the absorption cost method. We have already found that petitioner's method of valuing its inventories was improper and, after taking into consideration all the evidence of record, we are unable to conclude under the circumstances here involved that the respondent abused his discretion in determining petitioner's inventories by use of the absorption cost method.

The inclusion of factory overhead costs in determining the value of ending inventories has been part of the Internal Revenue regulations as far back as the Revenue Act of 1918.[9] The inclusion of factory overhead expenses is essential in determining the values of inventories. *Garden City Feeder Co.*, 35 B.T.A. 770 (1937). See also *Elgin National Watch Co.*, 17 B.T.A. 339 (1929); *Western Wheeled Scraper Co.*, 14 B.T.A. 496 (1928). The merits of the absorption cost method were before this Court in *Frank G. Wikstrom & Sons, Inc.*, supra. In *Wikstrom*, the Commissioner allocated a portion of the total overhead expenses based upon the relation of the number of production hours of each year represented in the closing inventories of that year to the total production hours of that year. The taxpayer did not contest the method of allocation used by the Commissioner nor

[8] See fn. 7, *supra*.
[9] Regs. 45, art. 1583(2).

did it contest the fact that an allocation of overhead to inventories is proper for a manufacturing concern. But the taxpayer did contest an allocation of overhead for its business where the products manufactured were made on special orders. The taxpayer argued that under those circumstances the products manufactured were not "merchandise" as that term is used in the regulations.[10] This Court, in approving the Commissioner's determination, stated:

no authority is cited and the Court sees no reason to hold that the word [merchandise] was not intended to cover articles of the kind produced by the petitioner. The method [absorption cost] applies as appropriately to the petitioner's business as to that of the manufacturer of duplicate articles. It does not distort the income of the petitioner. Indeed, it is superior, since allocating overhead to cost of goods sold offsets that overhead against the sales of each year in computing the income of that year and thus gives a better correlation between income and expense than the method used by the petitioner under which all overhead expenses are deducted in the year in which incurred, regardless of how much of the work done in that year might be represented in goods not sold during the year but carried over in the closing inventory. * * * the longer a particular job remains in inventory the greater the benefit of the Commissioner's method of retaining overhead costs to offset sales prices rather than deducting overhead annually and thus piling up a greater distortion of the ultimate profit or loss upon the disposition of the article. The evidence does not indicate that the application of this method to the petitioner's inventories would be unreasonably burdensome or expensive, as the petitioner contends. It does not require the allocation of the various overhead expenses to each item in the inventory but merely requires an allocation of a portion of the total overhead expenses to the total inventory in proportion to the number of production hours represented in that inventory. *The record fails to show that the method used by the Commissioner does not conform as nearly as may be to the best accounting practices in the trade or business.* [Emphasis added.]

Petitioner argues that consistency in the area of inventory valuation is of prime consideration, citing section 1.471-2(b), Income Tax Regs. We agree with petitioner that consistency should be given greater weight than any particular method of inventory valuation provided the method used conforms with the requirement of section 471. An erroneous method does not become acceptable solely upon the consistent use over an extended period of time. *D. Loveman & Son Export Corporation, supra.* Furthermore, we do not feel that the use of a method for a period of 2½ years before it is questioned is a sufficient period of time for the Court to give any weight to the element of consistency.

We do not find any merit to petitioner's contention that the respondent had approved of its method when an audit was made of petitioner's return for the fiscal year 1955 and no change was made in the ending inventories. *Wood v. Commissioner*, 245 F. 2d 888 (C.A. 5, 1957), affirming on this issue a Memorandum Opinion of this Court.

---

[10] Regs. 111, sec. 29.22(c)(3), promulgated under the Internal Revenue Code of 1939. This regulation is the predecessor of sec. 1.471-3,(c), Income Tax Regs., promulgated under the 1954 Code.

Respondent allocated the entire salary of petitioner's executive vice president in the amounts of $8,000 and $20,800 for the fiscal years 1959 and 1960, respectively, to factory overhead expense. This we feel was improper. The present record does not support the conclusion that the executive vice president's entire time was devoted to production matters. On the contrary, the record clearly indicates that the executive vice president performed important duties in connection with the bidding for contracts and the securing of loans from financial institutions, neither of which falls under the category of production functions. Based upon the entire record, we feel that an allocation of 20 percent of the executive vice president's salary for each year to factory overhead is reasonable, and we so hold. Cf. *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930). Respondent argues that even if the allocation of the entire salary of the executive vice president was improper the amount so allocated as compared to total officers' salaries was not unreasonable. On this record we cannot agree with respondent. There is nothing in the record to indicate that any other officer of petitioner, except the president, performed any production functions. Regarding the president, the only evidence is the fact that he made the major decisions. Since we have held above that the allocation of the entire salary of petitioner's executive vice president to factory overhead was improper, it becomes incumbent upon respondent to show that the amount so allocated was reasonable. This respondent has failed to do. There is insufficient evidence even to make a *Cohan* allocation on the president's salary. Cf. *H. Collings Downes*, 30 T.C. 396 (1958).

Petitioner having used an improper method of accounting and having failed to persuade this Court that respondent's determination by means of another method of accounting was arbitrary or unreasonable or that any other method of accounting would more clearly reflect petitioner's taxable income, respondent's determination, as adjusted, must prevail. We reach this result without attempting to lay down any broad principle applicable to inventories. *Frank G. Wikstrom & Sons, Inc., supra; D. Loveman & Son Export Corporation, supra.*

To reflect concessions made by both parties,

*Decision will be entered under Rule 50.*